OPINION
{¶ 1} Defendant-appellant Marcos Morales appeals his conviction and sentence from the Licking County Court of Common Pleas on one count of aggravated possession of drugs. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On April 5, 2004, the Licking County Grand Jury indicted appellant on one count of aggravated possession of drugs (methamphetamine) in violation R.C. 2925.11 (A)(C)(1)(e), a felony of the first degree. The indictment alleged that appellant knowingly obtained, used or possessed methamphetamine in an amount equal to or exceeding one hundred times the bulk amount. At his arraignment on April 19, 2004, appellant entered a plea of not guilty to the charge.
 {¶ 3} Subsequently, a jury trial commenced on July 16, 2004. The following evidence was adduced at trial.
 {¶ 4} At approximately 5:30 p.m. on March 25, 2004, Deputy Sheriff Greg Spung of the Licking County Sheriff's Department was sitting stationary in his marked cruiser on State Route 79 during his shift when he observed a Toyota Camry traveling 45 miles per hour in a posted 35 mile per hour speed zone. The deputy stopped the vehicle and ordered both occupants out of the same. After the two men in the vehicle were secured in other cruisers, Deputy Spung impounded and inventoried the vehicle.
 {¶ 5} At trial, Deputy Spung testified that appellant was driving the vehicle, which had an Arizona temporary tag. Alonso Garcia Ortiz was appellant's passenger. According to the deputy, appellant's driver's license listed an address in Phoenix, Arizona. Deputy Sheriff Spung cited appellant for speeding.
 {¶ 6} On cross-examination, Deputy Sheriff Spung testified that, on the date in question, he was working in coordination with the Central Ohio Drug Enforcement Task Force and that, at its direction, he executed a traffic stop on appellant. The following is an excerpt from Deputy Sheriff Spung's trial testimony:
 {¶ 7} "Q. Okay. And were you given a description of a vehicle that ultimately matched the one that Mr. Morales was driving?
 {¶ 8} "A. Actually, the description that was given to us wasn't even the right description.
 {¶ 9} "Q. Okay. Now, ultimately, without getting into exactly what was said to you, was the gist of the instructions that were given to you basically if you see a vehicle matching this description with these types of occupants, you're to execute this traffic stop?
 {¶ 10} "A. We were — I was to establish the reason for the stop first.
 {¶ 11} "Q. Okay. When you say establish the reason for the stop, would that be determining that, in fact, Mr. Morales was speeding?
 {¶ 12} "A. That could be — that was in the this case, yes, some type of violation, yes.
 {¶ 13} "Q. So basically they were just looking for an excuse to pull Mr. Morales over; is that correct?
 {¶ 14} "A. I don't know why they were wanting to stop the vehicle — wanting a reason to stop it." Transcript at 64-65.
 {¶ 15} The next witness to testify at trial was Mark Emde, a K-9 officer with the Heath Police Department. Officer Emde testified that, on March 25, 2004, he was asked to conduct a drug sweep on appellant's vehicle using Bella, his K-9 dog. Officer Emde testified that, during the sweep of appellant's vehicle, Bella alerted to drugs in the inside console of the same. The officer then informed Detectives Romano and Cortright about the positive signal from Bella.
 {¶ 16} Detective George Romano, who works for the City of Newark and is also assigned to the Central Ohio Drug Enforcement Task Force, testified that Detective Cortright, who is a field supervisor for the task force, received information that either a blue Ford Ranger or a green Toyota with two Hispanic males was "possibly in route to the Newark area with transport of methamphetamine in a large quantity." Transcript at 80. The vehicle, which was described as having Arizona or Indiana plates, was anticipated to arrive in approximately one hour. Based on the information, both marked and unmarked units from the task force, the Licking County Sheriff's Department and the Heath Police Department were aligned along State Route 70 and State Route 79 in an attempt to locate the vehicle.
 {¶ 17} Detective Romano testified that, while he was on State Route 79, a beige vehicle with Arizona tags passed by containing two Hispanic males. Deputy Sheriff Spung was then told to "effect a probable cause stop, to find a reason, to see if there was actual reason given to him to make a stop." Transcript at 82. Detective Romano testified that, after the stop, appellant was arrested because his driver's license was under suspension. After Bella alerted to drugs, Detectives Romano and Cortright began searching the vehicle in order to conduct an inventory and also to search for drugs. Detective Romano testified that when he looked inside the center arm rest console, he observed four plastic baggies containing a white powdery substance. Further search of the vehicle yielded one large baggie containing white powder near the gearshift knob. The following is an excerpt from Detective Romano's trial testimony:
 {¶ 18} "Q. You're not talking about the actual knob itself; you're talking about the base of the shifting lever?
 {¶ 19} "A. Correct, sir, the trim, if you will, around it.
 {¶ 20} "Q. Okay. You said that you looked at it, and did you notice something about it?
 {¶ 21} "A. I did, sir. Obviously it's right in my face. I work with vehicles quite often. Vehicles are put together in a nice, clean manner. This particular console, that cover was raised up, I don't know, maybe a quarter of an inch, if that high. It was not fitting like it should be. With that being out of the ordinary, I popped that up. . . ." Transcript at 91-92. The detective requested that fingerprint analysis be conducted on the baggies.
 {¶ 22} Detective Romano further testified that there were no clothes or luggage in the vehicle and that he was "struck by the lack of contents in the vehicle" since someone traveling from Arizona to Ohio would most likely have some type of luggage. Transcript at 98. When asked, the detective testified that the current street value of methamphetamine is $100.00 a gram and that approximately $35,000.00 worth of methamphetamines were found.
 {¶ 23} Detective Romano, when questioned on cross-examination about who Detective Cortright received the information about the vehicle containing two Hispanic males from, testified that, due to an on-going investigation, he was unable to reveal the name of such individual. After a brief side bar discussion, Detective Romano, however, did testify that such information came from an individual who had been arrested based on a narcotics investigation in another city.
 {¶ 24} The next witness to testify at trial was Timothy Elliget, a criminalist with the City of Newark who is an expert in the area of drug testing identification and fingerprint analysis. Elliget testified that each of the baggies found in the vehicle was weighed individually and then a combined weight was determined and that the baggies were rebagged into 13 baggies. According to Elliget:
 {¶ 25} "In State's Exhibit 5, there were two separate plastic baggies which contained — one contained four and the other one contained five bags, so they've been indicated as two, which was the item number given by our property room clerk for identification. So A-1 was 27.5 grams. A-2 was 27.80 grams. 2-A-3 was 27.78 grams. 2-A-4 was 27.50 grams. 2-B-1 is 27.84 grams. 2-B-2 is 27.48 grams. 2-B-3 is 27.82 grams. 2-B-4 is 27 grams even. 2-B-5 is 27.52 grams." Transcript at 123. Elliget further testified that, in addition to the above nine bags, bag 1-A contained 27.79 grams, bag 1-B contained 27.58 grams, bag 1-C contained 27.88 grams, and bag 1-D contained 27.66 grams. Elliget testified that testing on all thirteen baggies led him to conclude that the contents were methamphetamines.
 {¶ 26} On cross-examination, Elliget was questioned about testing that he had performed on a partial palm print found on one of the baggies. Elliget testified that he conducted comparisons between such print and known samples from appellant and Ortiz, his passenger, and that the partial print did not match either appellant or Ortiz.[1]
 {¶ 27} Appellant testified at trial in his own defense. Appellant testified that he lives in Indianapolis with his wife and that, during early March of 2004, he traveled from Indianapolis to Arizona with his wife and her daughter to visit family. Appellant testified that after his Chevrolet Lumina car broke down in Arizona, he borrowed his sister's 1999 "brownish, beige" Toyota Camry to return to Indianapolis. Transcript at 140. According to appellant, Alonso Garcia Ortiz, his passenger at the time of the incident in this case, normally drove a 1995 blue Ford truck.
 {¶ 28} Appellant further testified that two weeks before he came to Ohio, the keys to the Toyota Camry disappeared and that he found them a week before leaving for Ohio. When asked why he traveled to Ohio and why Mr. Ortiz had joined him, appellant testified that he had money problems and was coming to Ohio to borrow money from someone Ortiz had introduced him to. Appellant testified that he insisted that Ortiz join him on his trip to Ohio because Ortiz knew his way around and had been to Licking County before whereas appellant had not. While Ortiz did not want to come with appellant, he finally relented, although appellant testified that Ortiz did not want to talk during the trip and asked appellant to turn off the radio.
 {¶ 29} Appellant admitted that he was speeding when he got off State Route 70 and onto State Route 79, although he testified that he was not going "as fast as they're saying I did." Transcript at 146. Appellant denied that the drugs found in the car that he was driving were his and testified that he was unaware that the drugs were in the vehicle.
 {¶ 30} At trial, appellant further testified that the person who he was coming to Ohio to borrow money from was named Ricardo and that Ricardo had been mad at appellant in the past and did not like him. Appellant indicated that he thought of Ricardo when he was stopped by the police, but testified that he never gave this information to the police.
 {¶ 31} At the conclusion of the evidence and the end of deliberations, the jury, on July 16, 2004, found appellant guilty of aggravated possession of drugs (methamphetamine). The jury further found that the amount of methamphetamine involved "did equal or exceed 100 times the bulk amount of Methamphetamine; to wit, more than 300 grams of Methamphetamine." As memorialized in a Judgment Entry filed on July 27, 2004, appellant was sentenced to ten years in prison.
 {¶ 32} Appellant now raises the following assignments of error on appeal:
 {¶ 33} "I.THE DEFENDANT'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY THE STATE'S FAILURE TO PROVIDE EVIDENCE TO THE APPELLANT IN DISCOVERY.
 {¶ 34} "II. THE CONVICTION OF THE APPELLANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 35} "III. THE TRIAL COURT ERRED IN INSTRUCTING THE JURY UPON BULK AMOUNT OF, AND THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 36} "IV. THE TRIAL COURT ERRED IN SENTENCING THE APPELLANT TO TEN YEARS MINIMUM MANDATORY TIME.
 {¶ 37} "V. THE DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL."
 I {¶ 38} Appellant, in his first assignment of error, argues that his constitutional rights were violated when the State failed to provide evidence favorable to appellant in discovery. Appellant specifically argues that the State violated constitutional his rights by failing to provide the name of the tipster/confidential informant who informed police that methamphetamine was going to be brought into Licking County on the date in question and by failing to provide a report regarding the partial palm print found on one of the baggies. We disagree.
 {¶ 39} Crim.R. 16(B)(1)(f) reads: "Upon motion of the defendant before trial the court shall order the prosecuting attorney to disclose to counsel for the defendant all evidence, known or which may become known to the prosecuting attorney, favorable to the defendant and material either to guilt or punishment. * * *." In Brady v. Maryland (1963),373 U.S. 83, 87, 83 S.Ct. 1194, the United States Supreme Court held that the "[s]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." To establish a violation, a defendant must prove that the prosecution failed to disclose evidence upon request, the evidence was favorable to the defense, and the evidence was material. State v.Garn, Richland App. No. 02CA45, 2003-Ohio-820 at paragraph 23, citingMoore v. Illinois (1972), 408 U.S. 786, 92 S.Ct. 2562. "[T]he test ofBrady materiality is whether there exists a reasonable probability that the result would have been different had the evidence been disclosed to the defense." State v. Franklin, Montgomery App. No. 19140, 2002-Ohio-6193 at paragraph 13, citing State v. LaMar (2002), 95 Ohio St.3d 181, 187,2002-Ohio-2128, 767 N.E.2d 166.
 {¶ 40} As is stated above, appellant argues that he should have been provided with the name of the tipster/confidential informant after requesting the same at trial. The state's privilege of non-disclosure of the identity of a confidential informant is limited by fundamental fairness. The question of disclosure of a confidential informant becomes a balancing of the defendant's right to confront his accusers, and the state's right to preserve the anonymity of informants. State v. Phillips
(1971), 27 Ohio St.2d 294, 272 N.E.2d 347. Rovario v. United States
(1957), 353 U.S. 53, 77 S.Ct. 623. Thus, the privilege must yield if the defendant demonstrates the identity is either necessary or relevant.State v. Feltner (1993), 87 Ohio App.3d 279, 622 N.E.2d 15.
 {¶ 41} In the case of State v. Williams (1983), 4 Ohio St.3d 74,446 N.E.2d 779, the Ohio Supreme Court stated that an informant's identity should be disclosed to a defendant when: (1) it is vital to establishing an element of the crime, or (2) would be helpful or beneficial to the accused in preparing or making a defense to criminal charges. Id. at syllabus. The defendant bears the burden of establishing the necessity for disclosure. State v. Parsons (1989), 64 Ohio App.3d 63,69, 580 N.E.2d 800.
 {¶ 42} Generally, disclosure is not required where the informant was not an active participant in the criminal activity, but was merely a tipster. See Parsons, supra. It is also not required where the informant's involvement was limited to providing information relevant to probable cause. Feltner, supra, at 282, Parsons, supra at 676-8.
 {¶ 43} In the case sub judice, appellant did not show a specific need for the identity of the informant. This was not a case where the informant virtually became a state's witness. See Williams, supra, at 76; Feltner, supra, at 282. Rather, the informant in this matter was merely a tipster whose involvement was limited to providing information relevant to probable cause. See State v. Wilson, 156 Ohio App.3d 1,2004-Ohio-144, 804 N.E.2d 61.
 {¶ 44} Furthermore, after requesting the name of the tipster/confidential informant from Detective Romano, an off-the-record bench discussion was held. After such discussion, Detective Romano testified that he preferred not to give such information due to an on-going investigation. After defense counsel asked the court to direct Detective Romano to answer, another unrecorded off-the-record discussion was held at the bench after which Detective Romano testified that the tip had been obtained from an individual who had been arrested based on a narcotics investigation in a different city. Appellant did not object to such testimony or inquire further. Finally, at trial, appellant himself testified that he believed that "Ricardo" had set him up, although he admitted that he did not give Ricardo's name to the police. Thus, appellant had an opportunity at trial to set forth the defense that he had been "set up."
 {¶ 45} As is stated above, appellant also argues that his constitutional rights were violated by the State's failure to provide him with a copy of a report stating that the partial palm print found on one of the baggies did not match appellant's. However, there is no evidence that such a report existed.[2] Furthermore at trial, Timothy Elliget testified that, after comparing the partial print with known samples from appellant and Ortiz, he determined that the print did not match either of such individuals. Appellant clearly had an opportunity to cross-examine Elliget about his conclusions. In short, we find that appellant's constitutional rights were not violated by the State.
 {¶ 46} Based on the foregoing, appellant's first assignment of error is overruled.
 II {¶ 47} Appellant, in his second assignment of error, argues that his conviction for aggravated possession of drugs (methamphetamine) is against the manifest weight of the evidence because the element of "possession" was not established. We disagree.
 {¶ 48} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Martin (1983), 20 Ohio App.3d 172,175, 485 N.E.2d 717. See also, State v. Thompkins, 78 Ohio St.3d 380,1997-Ohio-52, 678 N.E.2d 541. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin at 175.
 {¶ 49} Appellant, in the case sub judice, was convicted for one count of aggravated possession of drugs (methamphetamine) in violation of R.C.2925.11 (A)(C)(1)(e). Revised Code 2925.11 states, in relevant part, that "(A) No person shall knowingly obtain, possess, or use a controlled substance." Possession is defined by R.C. 2925.01(K) as: "[H]aving control over a thing or substance but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found."
 {¶ 50} "Possession may be actual or constructive." State v. Kobi
(1997), 122 Ohio App.3d 160, 174, 701 N.E.2d 420. To establish constructive possession of illegal drugs, the evidence must prove that the defendant was able to exercise dominion and control over the contraband. State v. Wolery (1976), 46 Ohio St.2d 316, 332, 348 N.E.2d 351. Dominion and control may be proven by circumstantial evidence alone.State v. Trembly (2000), 137 Ohio App.3d 134, 141, 738 N.E.2d 93. Circumstantial evidence that a defendant was located in very close proximity to readily usable drugs may show constructive possession. Statev. Barr (1993), 86 Ohio App.3d 227, 247-248, 620 N.E.2d 242.
 {¶ 51} In the case sub judice, appellant was driving a car that was owned by his sister. The large amount of methamphetamines were found in both the console around the gear shift assembly and in the center armrest compartment, which was right at appellant's elbow. Thus, the methamphetamines were found in close proximity to appellant in a car which was under appellant's control. Based on the foregoing, we find that appellant's conviction for aggravated possession of drugs was not against the manifest weight of the evidence since there was evidence that appellant was able to exercise dominion and control over the drugs.
 {¶ 52} Appellant's second assignment of error is, therefore, overruled.
 III, IV {¶ 53} Appellant, in his third assignment of error, contends that the trial court erred in instructing the jury that the bulk amount of methamphetamine is three grams since the State "never offered any testimony as to what the bulk amount for Methamphetamine was." With respect to his third assignment, appellant further argues that because there was no testimony as to bulk amount, the jury erred in convicting him of possession of 100 times the bulk amount. Finally, in his fourth assignment of error, appellant maintains that the trial court erred in sentencing him to prison for possession of 100 times the bulk amount when the "bulk amount was never proven beyond a reasonable doubt or even testified to."
 {¶ 54} The trial court, in the case sub judice, instructed the jury as follows:
 {¶ 55} "If your verdict is guilty, you will separately decide beyond a reasonable doubt the amount of methamphetamine involved at the time of the offense and whether that amount was equal to or exceeding 100 times the bulk amount of methamphetamine. The bulk amount of methamphetamine is three grams. You will need to determine if the amount of methamphetamine did or did not equal or exceed 100 times that amount, to wit: More than 300 grams of methamphetamine." Transcript at 180.
 {¶ 56} Since appellant's counsel did not object at trial to the jury instructions, this assignment of error must be reviewed under a plain error analysis. Under the plain error doctrine, reversible error occurs only if "but for the error, the outcome of the trial clearly would have been otherwise." State v. Long (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, paragraph two of the syllabus. Further, notice of plain error is to be taken only with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. Id. at paragraph three of the syllabus.
 {¶ 57} While appellant argues that the court was required to have testimony or other proof as to the definition of "bulk amount," we disagree. Methamphetamine is a Schedule II drug by statute. The bulk amount of a controlled substance containing any amount of a schedule II stimulant is three grams. R.C. 2925.01(D)(1)(g). At the trial in this matter, Timothy Elliget testified as to the amount of methamphetamine found in each baggie.
 {¶ 58} As noted by the court in State v. Feltner (Aug. 16, 1989), Miami App. No. 88-CA-34, 1989 WL 94550: "Crim.R. 27 adopts for criminal proceedings the judicial notice provisions of Civ.R. 44.1. The rule requires the court to take full judicial notice of the statutory law of Ohio and to present that law to the jury without separate proof. The jury is required to accept the court's instruction.
 {¶ 59} "No additional proof beyond the terms of the statute was required for the court's determination for the jury of the meaning of "bulk amount". . . . Testimonial proof of the weight and content of the material offered for sale by Feltner then permitted the jury to conclude that the terms of the statute were met." Id at 5.
 {¶ 60} Likewise, in the case sub judice, testimony from Timothy Elliget as to the amount of methamphetamine in each baggie permitted the jury to conclude that appellant possessed 100 times the bulk amount of methamphetamine. No additional proof was required. Based on the jury's conclusion, the trial court correctly sentenced appellant to prison for possessing 100 times the bulk amount.
 {¶ 61} Based on the foregoing, appellant's third and fourth assignments of error are overruled.
 V {¶ 62} Appellant, in his fifth assignment of error, argues that he received ineffective assistance of trial counsel. We disagree.
 {¶ 63} The standard of review of an ineffective assistance of counsel claim is well-established. Pursuant to Strickland v. Washington (1984),466 U.S. 668, 687, 104 S.Ct. 2052, 2064, in order to prevail on such a claim, the appellant must demonstrate both (1) deficient performance, and (2) resulting prejudice, i.e., errors on the part of counsel of a nature so serious that there exists a reasonable probability that, in the absence of those errors, the result of the trial court would have been different. See State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.
 {¶ 64} In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. Bradley, 42 Ohio St.3d at 142. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists that counsel's conduct fell within the wide range of reasonable, professional assistance. Id. at 142.
 {¶ 65} In order to warrant a reversal, the appellant must additionally show he was prejudiced by counsel's ineffectiveness. This requires a showing that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Bradley, supra at syllabus paragraph three. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.
 {¶ 66} Appellant specifically contends that he was denied effective assistance of counsel since counsel failed to file a Motion to Suppress. Appellant argues that such a motion should have been filed since "given the fact the police stopped a vehicle outside the description of the vehicle they received the tip about and were given orders to make up or create a reason to stop the vehicle, a Motion to Suppress was necessary and would likely have prevailed."
 {¶ 67} However, testimony was adduced at trial that appellant was stopped for speeding. In fact, when appellant took the stand at trial, he admitted that he was speeding, although he denied that he was traveling as fast as was reported. The officer's act of stopping appellant was justified because appellant was admittedly speeding. See State v.Robinette, 80 Ohio St.3d 234, 239, 1997-Ohio-343, 685 N.E.2d 762.
 {¶ 68} Furthermore, appellant, whose license was under suspension, was lawfully detained. Police need not have a reasonable suspicion of drug-related activity prior to subjecting an otherwise lawfully detained vehicle to a canine sniff. State v. Rusnak (1997), 120 Ohio App.3d 24,28, 696 N.E.2d 633, 636-637. In United States v. Place (1983),462 U.S. 696, 103 S.Ct. 2637, the United States Supreme Court held a canine sniff is not a search under the Fourth Amendment. However, probable cause arises if the drug dog alerts to a certain area of the vehicle. Such was the case in this matter. Since Bella, the drug dog, alerted, the officers had probable cause to inspect appellant's vehicle for drugs. Based on the foregoing, we cannot say that counsel was ineffective in failing to file a Motion to Suppress.
 {¶ 69} Appellant also argues that trial counsel was ineffective in not requesting a comparison of the partial palm print found on one of the baggies with the palm print of Alonso Garcia Ortiz, appellant's passenger. However, as is stated above in the facts, testimony was adduced at trial that the partial palm print was neither appellant's nor Ortiz's. Furthermore, at trial, appellant testified that the drugs were not his and that he was unaware that they were present in the car. We find, therefore, that counsel was not ineffective.
 {¶ 70} Finally, while appellant contends that counsel failed to investigate all aspects of his case, we note that anything that trial counsel did in the way of preparation is outside the record and should not be considered by this Court. When an allegation of ineffective assistance is based upon materials which are not part of the record, the merits of the argument cannot be addressed. State v. Sheffey, (Sept. 30, 1993), Ashtabula App. No. 92-A-1760, 1993 WL 408165.
 {¶ 71} Finally, upon our review of the record as a whole, we cannot say that but for counsel's alleged errors, the result of appellant's trial would have been different.
 {¶ 72} Appellant's fifth assignment of error is, therefore, overruled.
 {¶ 73} Accordingly, the judgment of the Licking County Court of Common Pleas is affirmed.
Edwards, J. Gwin, P.J. and Hoffman, J. concur
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Licking County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] Elliget testified that he was never supplied with a sample of a palm print by Ortiz, but used a known sample for comparison.
[2] A laboratory report stating that a "partial palmprint was recovered" was provided to appellant in discovery.